SAFECO INSURANCE COMPANY OF AMERICA and Eatherly Construction Company, Plaintiffs–Appellants/Cross–Appellees,

v.

CITY OF WHITE HOUSE, TENNESSEE, Defendant–Appellee/Cross–Appellant,

United States Environmental Protection Agency, Intervenor–Appellee.

Nos. 97–6094, 97–6105.

United States Court of Appeals, Sixth Circuit.

Argued: Feb. 3, 1999

Decided and Filed: Sept. 20, 1999

Alfred H. Knight (argued and briefed), Alan D. Johnson (briefed), Willis & Knight, Nashville, Tennessee, for Plaintiffs–Appellants/Cross–Appellees.

Peter H. Curry (argued and briefed), Robb S. Harvey (briefed), Tuke Yopp & Sweeney, Nashville, Tennessee, for Defendant–Appellee/Cross–Appellant.

Lisa W. Edwards (argued and briefed), Mark L. Gross (briefed), Richard S. Ugelow, Charles E. Leggott, U.S. Department of Justice, Civil Rights Division, Appellate Section, Washington, D.C., for Intervenor–Appellee.

Before: MARTIN, Chief Judge; and NELSON and BOGGS, Circuit Judges.

## OPINION

BOGGS, Circuit Judge.

Safeco Insurance Company of America and Eatherly Construction Company appeal from two final orders of the district court. Appellants believe that the district court made several errors in the case, which involves an alleged breach of contract by Eatherly. Also, the contract incorporated EPA regulations that Appellants believe violated the Constitution by imposing improper race-based preferences. A jury found that Appellants did not prove that Eatherly did not breach the contract; the district court ruled that the regulations, as it found them to exist, did not violate the Constitution. The City of White House cross-appeals from the district court's order awarding White House damages for the breach but denying it prejudgment interest. We vacate the judgments below and remand for further proceedings.

## I. Background to the Appeal

### A. Bid and Execution of Contract

In January 1987, the City of White House, Tennessee ("White House") advertised for bids on Contract III, Job No. 78–16 ("the Project"), for the construction of a sanitary sewer system for White House. On March 12, 1987, White House opened the bids. Eatherly Construction Company, a Tennessee partnership, submitted the low bid, priced at $2,643,749.10. Moore Construction Company submitted the second-lowest bid, at $2,998,029.56, *see Safeco Ins. Co. v. City of White House, Tennessee*, 36 F.3d 540, 543 (6th Cir.1994) ("*Safeco I*")—$345,280.46 higher than Eatherly's bid.[1] White House chose Eatherly, the low bidder. On March 12, 1987, Safeco Insurance Company of America, a Washington corporation, executed a "Bid Bond." In return for a payment of five percent of the amount bid by Eatherly, Safeco pledged to act as surety for any agreement between Eatherly and White House.

The EPA had already offered a grant to White House to help pay for the Project.

---

1. At one point during litigation, White House and Safeco stipulated to different figures, assigning Eatherly a bid of $2,643,289.10 and Moore a bid of $2,989,029.50, for a difference of $345,740.40. The parties do not explain why they chose these figures (the Moore stipulation appears to transpose digits). When White House presented its proof of damages, it gave amounts of $2,643,749.10 and $2,996,-596.18, and calculated a difference of $352,-847.08. The district court eventually awarded White House the sum of $352,847.08.

To receive the grant, White House had to ensure compliance with several EPA requirements. Thus, White House selected the low bidder "subject to concurrence by the U.S. Environmental Protection Agency." Further, the contract documents incorporated EPA's standard and supplemental requirements (titled "Contractors on Federally Assisted Wastewater Facilities Construction Requirements"). One EPA mandate provided that, "A contractor must comply with the following provisions in its award of subagreements .... (d) The requirement for small, minority, women's and labor surplus area business in [40 C.F.R.] § 33.240." Another contract document stated that:

> It is the policy of the Environmental Protection Agency (EPA) to require its grantees to award a fair share of subagreements to small and minority and women's businesses on contracts ans [sic] subagreements performed under EPA construction grants. This requirement is contained in 40 *Code of Federal Regulations* Part 33 Section 240.

The contract also provided that, if Eatherly chose to subcontract part of the project, it must submit to the EPA—and to White House, within 10 days after the bid opening—"evidence of the positive steps taken to utilize small, minority, and women's businesses."

On April 9, 1987, Eatherly executed the contract and returned it to White House, which executed the contract on April 16, 1987. On that day, Safeco agreed to act as surety on a "Payment Bond" (guaranteeing that Eatherly would pay its subcontractors and pay for materials and labor) and a "Performance Bond" (guaranteeing White House that Eatherly would perform).

The contract provided that, within 90 days of execution, White House would issue a Notice to Proceed. Thus, White House had until July 15, 1987, to issue the Notice. To verify compliance with the contract terms (including the EPA requirement), the contract required Eatherly to document its compliance, and it permitted White House to reject the bid if Eatherly did not comply. On June 17, 1987, Eatherly informed White House that Eatherly was withdrawing its bid pursuant to its belief that the contract allowed withdrawal after 90 days from the date of bid opening. *See Safeco I*, 36 F.3d at 543.

On July 16, 1987, White House awarded the contract to Moore Construction Company, the second lowest bidder, for its original bid plus $20,000 for an increase in the price of materials. *See ibid.* On July 23, 1987, White House wrote to Safeco to demand payment under the Bid Bond. White House contended that Eatherly failed to comply with the EPA requirements; Eatherly contended that it complied with all requirements and that it did not breach the contract by withdrawing the bid. Faced with these conflicting arguments, Safeco sought a declaratory judgment resolving its liability to White House.

### B. Initial Proceedings in District Court

In November 1987, Safeco filed a complaint in federal court seeking a declaratory judgment regarding the extent of its liability under the Bid Bond. On information and belief, Safeco related Eatherly's contentions that Eatherly complied with the contract requirements; that White House neither unconditionally accepted the bid nor unconditionally awarded the contract; and that the contract permitted Eatherly to withdraw the bid. Because Safeco (a Washington corporation) named White House (Tennessee) and Eatherly (Tennessee) as defendants, it asserted federal jurisdiction based on diversity. In its answer, White House asserted counterclaims and cross-claims against Safeco and Eatherly for damages under the Bid Bond and Performance Bond, and White House cross-claimed against Eatherly for breach of contract.

Continuances, motions, a magistrate judge's report, and orders followed. The

district court adopted the magistrate judge's report that held that Eatherly and White House had a contract, but that material issues of fact remained regarding whether Eatherly breached it by failing to make a good-faith effort to comply with the EPA regulations. In 1990, Chief District Judge Nixon, as he was then, realigned the parties to align Eatherly with Safeco. To preserve diversity, Judge Nixon dismissed without prejudice Eatherly, which he found dispensable.

Eatherly reacted by filing an action in state court against Safeco and White House. *See Safeco I*, 36 F.3d at 544. Safeco asked District Judge Nixon to stay the federal case, but he denied the motion. White House filed a motion for summary judgment claiming that Eatherly committed anticipatory breach by withdrawing its bid after the contract arose. District Judge Nixon granted the motion. He awarded damages of $352,847.08, pre-judgment interest of $207,358.03, and attorney's fees and costs.

### C. Safeco I and its Aftermath

Safeco appealed to this court. On October 3, 1994, this court issued its decision in *Safeco Insurance Company v. City of White House, Tennessee*, 36 F.3d 540 (6th Cir.1994) ("*Safeco I*"). We held that the district court had subject matter jurisdiction because it did not err by dismissing Eatherly. *See id.* at 544–46. Next, we held that a contract bound Eatherly and White House. *See id.* at 546–47. We reversed the district court's finding that Eatherly breached the contract. We explained that EPA approval served both as "a promise and condition for Eatherly." *Id.* at 548. "Eatherly was under a duty to seek EPA approval, and yet EPA approval was itself a condition of Eatherly's duty to perform." *Ibid.* The opinion concluded by explaining the district court's error:

> The issue of breach, then, centers on whether Eatherly exercised good faith in its attempts to comply with the EPA's requirements. If Eatherly made a good

faith effort to comply with the EPA's regulations, and the EPA nonetheless withheld approval, Eatherly would have satisfied its obligations under the contract, and Eatherly would have no duty to perform further.

> Exactly what constitutes a good faith effort is a difficult question that involves a factual determination.... The analysis is complicated by the question of whether Eatherly withdrew its bid too early and whether Eatherly should have made further attempts to obtain EPA approval.... Thus, on the issue of breach, there is clearly a genuine issue of material fact concerning Eatherly's good faith.

*Ibid.*

Upon remand, the parties began preparing for trial. On June 12, 1995, the Supreme Court issued its opinion in *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995), which applied strict scrutiny to federal racial classifications governing construction projects. On June 30, Safeco moved for summary judgment, arguing that the EPA regulations violated the Constitution in light of *Adarand* and thus that the "contractual obligation is unenforceable."

On August 8, the district court granted White House's motion for a pre-trial ruling on damages. The court held that "the principal measure of damages in this case is, as this Court previously held [before *Safeco I*], the difference between the Eatherly Construction Company bid and the second low bidder's contract price." In September, the district court permitted the EPA, through DOJ, to intervene on the side of White House. In October, the court permitted Eatherly to intervene on the side of Safeco. Eatherly sought relief, claiming that, on their face and as applied, the regulations violated the "Equal Protection component of the Due Process Clause," and that the court should find the regulations void for vagueness. *Cf. Adarand*, 515 U.S. at 217–18, 115 S.Ct. 2097 (equating the equal protection obligations

imposed by the Fifth Amendment with those of the Fourteenth Amendment).

On March 20, 1996, the district court disposed of several motions. The court denied Safeco and Eatherly's motions for summary judgment. It granted EPA and White House's motions for partial summary judgment regarding the regulations' facial validity and lack of vagueness. The court explained that the regulations "do not trigger strict scrutiny analysis because they merely seek to ensure that minority firms are fairly notified of and considered for subcontracting opportunities. The regulations establish no set-asides, numerical goals, penalties, or financial incentives." The court denied summary judgment for EPA and White House regarding the constitutionality of the regulations, as applied.

On December 16, 1996, the court delivered another ruling. Cognizant of the impending jury trial, the court ruled as follows:

(1) The court, not the jury, would decide as a matter of law whether Eatherly suffered the unconstitutional application of the EPA regulations.

(2) Safeco had the burden of proof regarding excuses for Eatherly's non-performance on the contract claim.

(3) The jury would decide two issues:

(a) "Whether Eatherly ... breached the Contract by failing to satisfy its good faith obligation under the Contract to obtain EPA approval by complying with the EPA regulation incorporated in the Contract."

(b) "Whether it would have been futile for Eatherly Construction to have attempted to obtain EPA approval during the 28 day period following its purported 'withdrawal of its bid' (until July 15, 1987)."

(4) The court would not reconsider its order adopting the measure of damages.

(5) The parties must accept the holding of Safeco I that a contract existed.

Safeco and Eatherly objected to the jury instructions and interrogatories; the court overruled the objection. District Judge Nixon presided over a jury trial that lasted from April 15 to April 18, 1997. The jury found that Safeco did not prove that Eatherly acted in good faith, or that it would have been futile for Eatherly to attempt to obtain approval during the remaining 28 days. In August 1997, the court issued a memorandum and order. In the order, it adopted the jury findings. The court ruled, as a matter of law, that "the EPA did not require or induce Eatherly to award contracts on the basis of race." The district court held that, even if the regional EPA Project Officer had a personal belief about the policy, she did not enforce that belief on Eatherly. It found that, as applied, the regulation did not violate the Constitution.

In separate memoranda and orders, the district court awarded White House the previously-assessed damages ($352,847.08), but denied its request for pre-judgment interest. The court ruled that, although Tennessee law provided that White House may receive interest as a matter of right, equity dictated that Safeco should not have to pay interest, because it did not alone cause the ten-year delay that resulted in the large interest balance. The judge permitted White House to file an application for costs and attorney's fees.

Safeco and Eatherly appealed from the final judgments.[2] White House cross-appealed from the order denying an award of pre-judgment interest.

## II. Burden of Proof Regarding Eatherly's Alleged Breach of Contract

Although the issues in this appeal range from the constitutionality of a purported race-based preference to the availability in

---

2. One judgment forces Safeco, as surety, to pay damages to White House. As Eatherly observed in its motion to intervene, Safeco might bring an indemnification action against Eatherly. Thus, Eatherly has an interest in appealing the award against Safeco.

Tennessee of pre-judgment interest, those issues are subordinate to the question of whether Eatherly breached its contract with White House. In 1987, Safeco precipitated twelve years of litigation by requesting a declaratory judgment regarding its liabilities under bonds relating to the Project. White House responded by seeking damages under the bonds and claiming that Eatherly breached the contract. In *Safeco I*, we decided that a contract existed and that the finder of fact should decide on remand whether Eatherly breached the contract by failing to take good-faith efforts to comply with contractual provisions regarding EPA approval. *See Safeco I*, 36 F.3d at 548. Appellants' constitutional challenges serve merely as an affirmative defense to the asserted breach, and the matters involving damages, costs and attorney's fees, and pre-judgment interest also have relevance only if Eatherly breached the contract. Therefore, we first review the proceedings that resulted in a judgment that Eatherly breached the contract.

 Safeco contends that the district court propounded jury interrogatories that unfairly imposed the burden of proof on Safeco and Eatherly rather than on White House. Safeco also believes that the district court erred by refusing to instruct the jury on Safeco's proposed defense that Eatherly had a good-faith belief that it could withdraw its bid. Tennessee law governs the burden of proof in diversity actions. *See, e.g., In re Bendectin Litigation*, 857 F.2d 290, 312 (6th Cir.1988), *cert. denied sub nom. Hoffman v. Merrell Dow Pharm., Inc.*, 488 U.S. 1006, 109 S.Ct. 788, 102 L.Ed.2d 779 (1989). This court reviews de novo a district court's jury instructions. *See, e.g., Jones v. Federated Fin. Reserve Corp.*, 144 F.3d 961, 966 (6th Cir.1998). This court reviews for abuse of discretion a district court's use of jury interrogatories. *See United States v. H.M. Branson Distrib. Co.*, 398 F.2d 929, 936 (6th Cir.1968); *cf. Armstrong v. Dwyer*, 155 F.3d 211, 214 (3d Cir.1998)

(reviewing for abuse of discretion a court's formulation of jury interrogatories); *First Nat'l Bank v. Lustig*, 96 F.3d 1554, 1576 (5th Cir.1996) (same).

### A. The Jury Interrogatories

The district court submitted two questions to the jury:

1. Do you find that Safeco Insurance Company has proved that Eatherly Construction Company complied with its obligation under the contract to obtain EPA approval by complying with the regulation incorporated in the contract which required Eatherly Construction Company to make a good faith effort to solicit MBE, SBE, and WBE [Minority, Small, and Women's Business Enterprise] participation and to document its efforts to do so?

Then your answer, yes or no.

2. Do you find that Safeco Insurance Company has proved that it would have been futile or impossible for Eatherly Construction acting with reasonable diligence to have obtained EPA approval during the remaining 28-day period following its announcement that it was withdrawing its bid?

Answer, yes or no.

Safeco objected to the interrogatories and requested a general verdict; the judge overruled the objection. Safeco believes that White House should have borne the burden of proving that Eatherly failed to comply with the contractual obligation. Safeco also contends that the second interrogatory imposed an unprecedented burden.

 In 1987, Safeco initiated the proceedings by filing for a declaratory judgment. In its complaint, Safeco did not ask for a declaration of its lack of liability— rather, it asked for a determination of its liability under the Performance Bond. White House counter-claimed against Safeco and Eatherly, asserting their liability under the Performance and Bid Bonds, and it cross-claimed against Eatherly for

breach of contract. Although Safeco brought its complaint under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, Tennessee law governs the burden of proof for the non-federal matters. *Cf. American Eagle Ins. Co. v. Thompson*, 85 F.3d 327, 331 n. 3 (8th Cir.1996) (drawing this proposition from a Third Circuit case). Under Tennessee law, the burden of proof in a declaratory judgment action mirrors that of "ordinary actions at law or suits in equity." *Blake v. Plus Mark, Inc.*, 952 S.W.2d 413, 417 (Tenn.1997) (quoting 2 WALTER H. ANDERSON, ACTIONS FOR DECLARATORY JUDGMENTS § 375 (2d ed.1951)).

■■■ The interrogatories forced Safeco to prove that Eatherly did not breach the contract. As this court commanded in Safeco I, the remand involved the question of whether Eatherly breached by failing to perform: "Eatherly was under a duty to seek EPA approval, and yet EPA approval was itself a condition to Eatherly's duty to perform." *Safeco I*, 36 F.3d at 548. We observed that Tennessee contract law requires parties to make good-faith efforts to fulfill their contractual obligations, whatever the nature of the obligations. Thus, we explained, "[t]he issue of breach, then, centers on whether Eatherly exercised good faith in its attempts to comply with the EPA's requirements.... [O]n the issue of breach, there is clearly a genuine issue of material fact concerning Eatherly's good faith." *Ibid.* Under Tennessee law, a party seeking to recover on a contract has the burden of showing that the other party breached the contract. *See Life Care Ctrs. of America, Inc. v. Charles Town Assocs. Ltd. Partnership*, 79 F.3d 496, 513–14 (6th Cir.1996); *cf. Stash, Inc. v. Palmgard Int'l, Inc.*, 937 F.Supp. 531, 534 n. 8 (D.Md. 1996) (discussing declaratory judgment actions) ("It is a fundamental rule that the burden of proof in its primary sense rests

upon the party who, as determined by the pleadings, asserts the affirmative of an issue and it remains there until the termination of the action.") (quotation omitted).

■■■ White House correctly observes that Tennessee law requires parties to prove affirmative defenses, and White House claims that the interrogatories address Safeco's affirmative defenses of impossibility of performance and nonperformance of a condition precedent. White House fails to realize that if the answers to the interrogatories resolved nothing but those two purported affirmative defenses, the jury never decided whether Eatherly breached the contract, which was the sole issue impelling the remand. Also, White House cites inapposite cases. In Tennessee contract actions, if a plaintiff claims that a defendant breached a contract, the defendant may assert the affirmative defense that the *plaintiff* failed to comply with a condition precedent to the *defendant's* duty to perform; if the defendant asserts this defense, he bears the burden of proof.[3]

Here, however, Eatherly had an unconditional duty to seek EPA approval. Eatherly's compliance served as a condition precedent for *White House*, and if EPA denied approval in the face of a good-faith effort by Eatherly, then EPA's denial excused Eatherly's duty to perform. *Cf. Safeco I*, 36 F.3d at 548 (interpreting the contract). In the proceedings below, White House asserted that Eatherly did not adequately seek EPA approval—by this assertion, White House thus claimed that Eatherly breached. Had the jury ruled that Eatherly made a good-faith effort to perform its contractual duty, Eatherly could *then* assert an affirmative defense—*i.e.*, that EPA's intransigence excused Eatherly's nonperformance.

---

**3.** For example, *Harlan v. Hardaway*, 796 S.W.2d 953, 957 (Tenn.Ct.App.1990), cited by White House, supports this proposition. Two of the other cited cases, *Covington v. Robinson*, 723 S.W.2d 643, 646 (Tenn.Ct.App.1986), and *Investors Acceptance Co. v. James Talcott,* *Inc.*, 61 Tenn.App. 307, 454 S.W.2d 130, 140 (Tenn.Ct.App.1969), stand for a related point that, if a plaintiff sues a defendant for nonperformance, the plaintiff must show that the plaintiff satisfied any implied conditions precedent to the defendant's performance.

Thus, the district court erred by placing the burden of proof on Safeco, and both interrogatories suffer from this flaw. Safeco further objects to the second interrogatory because it required Safeco to prove the futility of Eatherly's obtaining EPA approval during the 28 days between Eatherly's withdrawal and the deadline for White House to issue the Notice to Proceed. The second interrogatory serves only to elicit circumstantial evidence of Eatherly's good faith (*e.g.*, if Eatherly could have obtained approval during the 28 days, perhaps it had not tried very hard before it withdrew its bid). We recognize that *Safeco I* mentioned that, "Of course, good faith does not require the doing of a futile act; but the issue of whether further efforts at compliance were futile needs to be decided by a trier of fact." *Safeco I*, 36 F.3d at 548. The first interrogatory subsumes the second, however, as the first asks whether Eatherly acted in good faith. The court erred by propounding the second interrogatory, as it imposed the burden of proof on the wrong party. At best the second interrogatory was superfluous; at worst it misled the jury regarding the standard of "good faith." On remand, White House might point to the 28-day period of inaction as evidence of a lack of good faith, *see* Part II.B *infra*, but, as a matter of law and logic, Safeco and Eatherly cannot prove that it would have been "impossible" for them to obtain approval during that time—one cannot prove with certainty that the EPA would not have approved the project during those days.

### B. Safeco's Proposed Jury Instruction

■ The district court rejected Safeco's proposed amendment to the jury instructions. Apparently, Safeco sought to preface the second interrogatory with an instruction or interrogatory (the record is unclear) that, "If you find that Eatherly Construction Company did not in good faith believe that they could withdraw, then they would have to prove it was possible to go forward." Safeco intended this

as a good-faith affirmative defense unrelated to the contractual obligation to make a "good-faith" effort to comply with the EPA regulations. Safeco wanted an instruction that, if the jury found that Eatherly believed, in good faith, that it had the right to withdraw its bid 90 days after the bid opening, the jury should ignore the 28 days between the bid withdrawal and the deadline for White House to issue a Notice to Proceed. If the jury so found, it would ignore the second interrogatory about "futility." The court did not add the instruction.

■ If Eatherly had a reasonable, good-faith belief that the contract permitted it to withdraw its bid after 90 days, the court should have instructed the jury as a matter of law to disregard Eatherly's actions after it withdrew the bid. "A good faith disagreement over the meaning of an ambiguous contractual provision does not constitute a breach of contract." *Boiler Supply Co., Inc. v. Lunn Real Estate Investments, Inc.*, No. 01A01–9605–CH–00246, 1998 WL 684599, at *4 (Tenn.Ct. App. July 1, 1998) (unpublished). If Eatherly had a reasonable belief that it could withdraw and terminate the contract, it did not have a duty to continue to attempt to comply with another contractual provision (i.e., the EPA regulations). Eatherly's belief about withdrawal does not excuse Eatherly's duty *before* withdrawal to obtain EPA approval, however, so Eatherly's belief about withdrawal affects only the second interrogatory, and not the first.

This issue did not receive adequate attention below. First, Safeco appears to have objected on the wrong grounds. At a bench conference, Safeco's attorney admitted that, "I know it's [the proposed instruction] not a defense, but it's part of the story." Second, the court did not explain its decision. Third, the parties did not refer to evidence about Eatherly's belief and the contract's language although, admittedly, the setting did not appear to lend

itself to such a presentation. Finally, Safeco should have asked the court to rule, as a matter of law, that a good-faith disagreement existed regarding the contract.

Because our decision vacates the prior judgment, Appellants will have the chance to correct this error and properly request the instruction. Appellants will bear the burden of proving Eatherly's reasonable, good-faith belief that the contract permitted Eatherly to withdraw its bid after 90 days. The court should instruct the jury that, if Appellants convince the jury that Eatherly had a good-faith belief that it could withdraw its bid after 90 days, the jury should disregard the 28–day period between the withdrawal of the bid and the deadline for White House to issue the Notice to Proceed. If some contractual provisions created in Eatherly a good-faith belief that Eatherly could withdraw its bid (without breaching the contract) after a certain date then, after that date, Eatherly did not have a duty to make a good-faith effort to comply with other, unrelated provisions.

### III. Matters Involving the EPA and its Minority Subcontractor Hiring Requirements

The previous section explored some issues implicated by White House's claim that Eatherly breached the contract. If Eatherly did not make a good-faith effort to comply with the terms of the contract (*i.e.*, to obtain EPA approval), it breached the contract. The EPA's involvement, however, introduces additional complexity. As discussed at pages 684–87 *infra*, the nature of the contract's incorporated EPA requirements remains unclear; after more than a decade of litigation, the parties cannot agree what actions the EPA required of Eatherly. Also, the parties dispute whether the judge or jury should have decided what standard the EPA used to assess Eatherly's compliance. Further, the Supreme Court's decision in *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995),

raises the possibility that the EPA requirements facially, or as applied to Eatherly by an EPA Project Officer, imposed an impermissible racial classification. Safeco has raised this as an affirmative defense to the claim of breach, arguing that, even if the finder of fact decided that Eatherly did not make a good-faith effort to comply with the EPA requirements, the court should hold the requirements unconstitutional and decline to enforce them. *Cf. Shelley v. Kraemer*, 334 U.S. 1, 19–20, 68 S.Ct. 836, 92 L.Ed. 1161 (1948). Because the EPA regulations, as applied to Eatherly, bear little resemblance to their text in the Federal Register, we begin by reciting the facts, to show the complexity faced by the district court throughout the course of this litigation.

### A. Eatherly's Attempts to Comply with the EPA Requirements

As discussed at pages 677–78 *supra*, the contract between Eatherly and White House incorporated an EPA regulation. Between March 12 and June 17, 1987, Eatherly took some steps to comply with the EPA requirements regarding subcontracting with small, minority, and women's businesses (hereinafter called "MBE" to accord with the parties' practice, as they dispute only Eatherly's compliance with the minority business provisions).

#### 1) Background of the EPA MBE Regulation

In 1983, EPA promulgated its final rules for "Procurement Under Assistance Agreements," which were published in 40 C.F.R. Part 33. *See* Procurement Under Assistance Agreements, 48 Fed.Reg. 12,-922 (1983). Subpart B governed "Procurement Requirements." Section 33.240 provided as follows:

> 33.240 Small, minority, women's, and labor surplus area businesses.
>
> (a) It is EPA policy to award a fair share of subagreements to small, minority, and women's businesses. The recipient must take affirmative steps to as-

sure that small, minority, and women's businesses are used when possible as sources of supplies, construction and services. Affirmative steps shall include the following:

(a)(1) Including qualified small, minority, and women's businesses on solicitation lists;

(a)(2) Assuring that small, minority, and women's businesses are solicited whenever they are potential sources;

(a)(3) Dividing total requirements, when economically feasible, into small tasks or quantities to permit maximum participation of small, minority, and women's businesses;

(a)(4) Establishing delivery schedules, where the requirements of the work permit, which will encourage participation by small, minority, and women's businesses;

(a)(5) Using the services and assistance of the Small Business Administration and the Office of Minority Business Enterprise of the U.S. Department of Commerce, as appropriate; and

(a)(6) If the contractor awards subagreements, requiring the contractor to take the affirmative steps in paragraphs (a)(1) through (a)(5) of this section.

(b) [Reserved].

(c) EPA encourages recipients to procure supplies and services from labor surplus area firms.

48 Fed.Reg. at 12,929.[4] The Eatherly–White House contract contained a slightly-modified version of these regulations.

Until 1983, EPA regions established "goals for MBE or WBE participation." 48 Fed.Reg. at 12,923. EPA stated that it used the goals "as a tool to determine whether the affirmative steps [of 40 C.F.R. § 33.240] were adequately carried out...." *Ibid.* The 1983 ruling altered procedures to permit EPA recipients

(here, White House), to "use their own goals, State goals, or other standards." *Ibid.*

In 1986, EPA issued a "Guidance" for its "fair share policy" in wastewater treatment construction grants. The Guidance anticipated that each State would establish a "fair share objective" and allocate the goal to particular construction projects. If a State had not established a goal for a specific grant project, the EPA recipient (*e.g.*, White House), "should establish an objective which it considers reasonable and achievable based on a number of factors such as the availability of minority and women-owned businesses in the geographic area where the project is being built." Nothing in the Joint Appendix shows that Tennessee or White House ever established fair share objectives for the state or for specific projects; in fact, the evidence suggests that White House took no steps to evaluate a fair share objective. Nancy Barron, who served from 1986–1988 as EPA MBE Project Officer for the State of Tennessee, declared that, "There was no fair share goal negotiated on this project [the Project], and no numerical goal that either White House or the prime contractor was expected to meet."

### 2) The MBE Regulation as Applied to Eatherly

Barron, the MBE Project Officer, declared that, when no fair share objective numerical goal existed, she made a subjective evaluation of a contractor's efforts to comply with EPA policy. "In situations like this, I evaluated a prime contractor's effort at compliance with the EPA's policies and regulations by whether it made a good-faith effort to solicit WBE/MBE participation, not on whether any particular level of WBE/MBE participation was achieved." In contrast, Appellants con-

---

4. In 1996, EPA deleted Part 33. *See* Grants and Agreements with Institutions of Higher Education, Hospitals, and other Non–Profit Organizations, 61 Fed.Reg. 6,066 (1996).

Slightly modified, the requirements once listed in 40 C.F.R. § 33.240 still govern assistance agreements with state and local governments. *See* 40 C.F.R. § 31.36(e).

tend that Barron conditioned project approval on the hiring of at least one MBE.

Robert Eatherly owns and manages Eatherly Construction Company. James Stacey, an Eatherly employee, had the responsibility of guaranteeing compliance with the MBE regulations. No local MBE candidates had the qualifications necessary to perform the subcontracting work on a pumping station; Eatherly chose Collier Construction, a non-MBE firm. Eatherly also chose to subcontract out work on pavement replacement, road boring, and gravity sewer lines. From Ed Walker, White House's engineer, Stacey obtained a list of MBEs that might perform the paving and secondary service line work. Apparently, the Tennessee Department of Economic and Community Development had compiled the list (the "master list").

From the master list, Stacey selected all MBEs located within driving distance of the Project and with the qualifications necessary to perform the subcontracted work. Those limits reduced the names to ten firms. Via certified mail, on March 30, 1987, Stacey invited the ten firms to bid on the subcontracting work. On April 1, Stacey had a telephone conversation with Barron. Barron informed Stacey that Eatherly had failed to comply with the EPA regulations within the ten-day period required by the contract. Because Barron found Stacey cooperative, Barron did not inform White House of this error. Stacey told Barron about the mailing, and Barron asked for a written list of the ten firms. Barron also suggested that, to obtain more names, Stacey contact Cecil Conley of the Tennessee Office of Minority Business Enterprise.

On April 6, Stacey mailed Barron a handwritten copy of the ten names. Although the original list contained ZIP codes, as did the certified mail receipts, Stacey did not copy the ZIP codes onto the handwritten list. In his letter, Stacey told

Barron that he would inform her of the responses from the MBEs.

Stacey received no responses to his mailings. Further, the post office returned three letters to Eatherly. Stacey telephoned one MBE from the list, Robert Crutchfield, who turned down the job because he had too much other work. Stacey telephoned another MBE from the list, HMC Contractors. Because of other work, HMC would not commit to the job, but told Stacey it would reconsider after Eatherly started work on the Project.

On April 27, Barron called Stacey to obtain a status report. Again, she told him to call Conley to obtain another list of MBEs.[5] She also asked Stacey to document all the steps he had taken, all responses to his letters, whether he made follow-up phone calls, and whether any firms expressed interest. Later, in a deposition, Barron admitted that she did not inform Stacey of her belief that the absence of ZIP codes rendered inadequate the handwritten list. Stacey told her that Collier, the non-MBE pumping subcontractor, agreed to subcontract $20,000 of work to an MBE.

On June 8, White House sent Eatherly a letter expressing unease with Eatherly's failure to obtain EPA approval for the MBE requirements; White House asked Safeco to give the matter its "closest attention." *Safeco I*, 36 F.3d at 543. On June 10, Stacey, Barron, and White House's attorney, David Amonette, participated in a conference call. Stacey claims that he told Barron that HMC might give Eatherly a commitment, and that Barron asked for a signed agreement between HMC and Eatherly. Amonette claims that Stacey said that Eatherly intended to use HMC. Barron claims that Stacey said he had a tentative commitment, but no price. Barron says that she told Stacey that, if he confirmed the commitment in writing, she

---

**5.** Conley testified that he did not remember receiving any telephone calls, messages, or letters from Eatherly or Stacey.

would approve the Eatherly contract, and she asked him to send the confirmation by Federal Express. That day, Amonette mailed a letter to Stacey to confirm Eatherly's intentions to use HMC, and to express his "understanding from our phone conversation with Mrs. Barron ... that upon receipt of your letter she would confirm that your company has the authority to proceed."

Stacey did not send the letter. He explained that, because he could not reach an agreement with HMC regarding price, he did not want to commit in writing to subcontract with HMC. Barron confirms that Stacey told her this on June 15. He did not call or write Amonette.

On June 17, Robert Eatherly met with Amonette, the Mayor, and some others. Eatherly asked what else he could do to obtain EPA approval, but White House representatives did not offer any advice. Believing that construction industry custom and the contract permitted him to withdraw starting 90 days after he submitted his bid,[6] Eatherly withdrew the bid. He testified that he withdrew the bid to permit Eatherly to commit to other contracts that it had a better chance of obtaining; that no one challenged his right to withdraw; and that the Mayor responded, "I don't blame you for withdrawing." Of course, Eatherly took no further action to comply with the EPA regulations.

July 15, 1987, the 90–day deadline for Eatherly to comply with the EPA regulations, came and went. Following Barron's directive after Eatherly withdrew its bid, White House had awarded the contract to Moore Construction Company, the second-lowest bidder. Claiming that Eatherly committed an anticipatory breach, White House demanded that Safeco comply with its promise on the Bid Bond. Safeco filed the declaratory judgment action.

### B. Legal Matters Implicated by the EPA Requirements

The contract incorporated EPA requirements that affect the litigation in two separate ways. First, the breach of contract claim requires elucidation of the requirements: as we held in *Safeco I*, under Tennessee law, Eatherly had a good-faith duty to comply with its contractual obligations, which included obtaining EPA approval. Second, in response to the breach of contract claim, Appellants have asserted the affirmative defense that the EPA requirements imposed an unconstitutional race-based preference. Obviously, as the first step in resolving these two matters, one must know precisely what the EPA required of Eatherly.

### 1) *Identifying the Appropriate Finder of Fact*

■ Before trial, the district court had concluded that "genuine issues of material fact exist with respect to whether EPA's regulations were constitutionally applied...." It thus refused to grant summary judgment on this issue for EPA and White House. In another pre-trial ruling, it decided to withhold the question from the jury, ruling that, "The legal determination as to whether specified conduct violates the Constitution is not within the province of the jury." After trial, the district court made "findings of fact" (consisting only of a narrative of the evidence offered at trial), and delivered its "conclusions of law," including the following: "[A]lthough Nancy Barron ... may have held a personal opinion on one aspect of promoting inclusiveness that went beyond official EPA policy, she did not act upon that opinion and require or induce Eatherly to award contracts on the basis of minority status."

We believe that the jury, and not the judge, should have decided the factual question about the nature of the standard

---

6. For example, the invitation for bids provided that, "No bidder may withdraw his bid within ninety (90) days after the actual date of opening thereof to allow the Owner to complete its financing arrangements." One could read this to permit withdrawals after 90 days.

of compliance required by Barron. (Safeco injected unnecessary confusion by casting this complaint as a request that the jury decide whether Barron unconstitutionally applied the regulation.) The district court called the issue one of "material fact," but decided the issue itself because it implicated constitutional issues. It seems that the jury should have decided *whether* Barron imposed a standard of good-faith-effort-to-solicit (as opposed to a standard of good-faith-effort-to-hire, or even one of compulsory hiring), and the district court then could have ruled whether Barron's practice constituted an unconstitutional racial classification. *Cf. Curtis v. Oklahoma City Public Schools Bd. of Educ.*, 147 F.3d 1200, 1211 n. 13 (10th Cir.1998) (discussing role of jury in First Amendment cases involving government employers). In the somewhat-related field of qualified immunity, even in circuits where judges rule on the reasonableness of state actors, juries still decide issues of material fact. *See, e.g., Sharrar v. Felsing*, 128 F.3d 810, 828 (3rd Cir.1997).

### 2) The District Court's Description of the EPA Requirements

After choosing to interpret the standard applied by Barron, the district court phrased its finding in the negative, writing that Barron did not "require or induce Eatherly to award contracts on the basis of minority status." This comment does not answer the question of what standard Barron in fact imposed; this omission makes it difficult to review the district court's conclusion that Barron did not unconstitutionally apply the regulation. Even after a searching review of Barron's depositions and declarations, we have difficulty ascertaining what standard she applied (and, relatedly, conveyed to Eatherly) in deciding whether Eatherly's actions satisfied her.

In fact, the record contains evidence that suggests that Barron in fact required more than a sincere attempt to solicit MBE subcontractors. Ambiguities in the testimony and exhibits permit the conclusion that she conditioned approval on documentation of Eatherly's commitment to *hire*, not of Eatherly's *attempt to solicit*, an MBE subcontractor. Further, her testimony appears inconsistent about both the degree of documentation she wanted from Eatherly, and the extent to which she disclosed these requirements to Eatherly.

### 3) Conflating the Breach of Contract Issue with the Racial Preference Issue

On remand, the district court should correct the aforementioned errors and should ensure that the constitutional analysis remains distinct from the breach of contract analysis. The breach of contract analysis involves Eatherly and its duty to make good-faith efforts to comply with the EPA requirements. Eatherly had a duty to comply only with those requirements *made known to* Eatherly, however. Thus, for purposes of deciding whether Eatherly made a good-faith effort to gain EPA approval, the district court should limit the investigation of the "EPA requirements" to the text of the contract, the regulations incorporated by the contract, and the requirements communicated to Eatherly by representatives of the EPA and White House. Eatherly had no duty to satisfy the subjective, unexpressed views of Nancy Barron. We mention this because the record reveals that the trial exposed the jury to statements by Barron that expressed her interpretation of the EPA regulations. To the extent she did not convey it to Eatherly, Barron's subjective interpretation of the regulations has relevance only for resolving whether she applied the regulation unconstitutionally—a matter distinct from the question of whether Eatherly made a good-faith effort to comply with the terms of the contract.

### 4) Constitutionality of the EPA Regulation

Because we hold that the district court erred by itself deciding how Barron applied the regulation and by phrasing its

finding only in the negative, we cannot review its judgment about the constitutionality of the regulations. To provide guidance on remand, we discuss the matter insofar as the record permits.

### a) Standing

■ Although no party mentions whether Appellants have standing to challenge the constitutionality of the statute, this court must assure itself of jurisdiction. If we assume for the sake of argument that the regulations impose a racial preference and force contractors to hire MBEs, Appellants must still demonstrate that they suffered an injury. *See Bras v. California Pub. Utils. Comm'n*, 59 F.3d 869, 872 (9th Cir.1995), *cert. denied*, 516 U.S. 1084, 116 S.Ct. 800, 133 L.Ed.2d 748 (1996). Unlike the affirmative action plans often struck down by courts, the EPA regulations do not (apparently) exempt MBE *contractors* from the requirements of compliance.[7] All contractors face the same burden in finding subcontractors, so white contractors do not suffer a competitive disadvantage (this assumes, of course, that one cannot subcontract to oneself). Compare, as a representative example, *Concrete Works of Colorado, Inc. v. City and County of Denver*, 36 F.3d 1513, 1518–19 (10th Cir.1994), *cert. denied*, 514 U.S. 1004, 115 S.Ct. 1315, 131 L.Ed.2d 196 (1995), which found that a bidder had standing because "minority and women-owned prime contractors may use their own work to satisfy MBE and WBE participation goals." *Id.* at 1518; *see also Monterey Mechanical Co. v. Wilson*, 125 F.3d 702, 706 (9th Cir.1997) (finding standing where the challenged law exempted MBEs from goal and "good-faith" requirements).

■ Appellants have standing. The alleged failure to comply with the regulations did not result in the loss of a bid to an advantaged competitor, but did result in the loss of a contract and the institution of a suit. Further, even if the assumed-unconstitutional regulations do not place one contractor at a competitive disadvantage with other contractors, the regulations place white *subcontractors* at a disadvantage. "A person required by the government to discriminate by ethnicity or sex against others has standing to challenge the validity of the requirement, even though the government does not discriminate against him." *Monterey Mechanical*, 125 F.3d at 707; *see also Lutheran Church–Missouri Synod v. FCC*, 141 F.3d 344, 350–51 (D.C.Cir.1998) (echoing this proposition, casting it as a matter of third-party standing), *reh'g denied*, 154 F.3d 487 (D.C.Cir.1998); *cf. Lutheran Church*, 141 F.3d at 349–50 (finding injury-in-fact where compliance with governmental racial hiring preferences caused "economic harm by increasing the expense" of running the business). Satisfied that Safeco and Eatherly may challenge the regulations, we turn to the requirements imposed by White House and EPA.

### b) The EPA Requirements

■ White House and EPA repeatedly emphasize that the requirements do not impose a numerical quota, but that they instead ask only for a "good-faith effort," and thus cannot impose a racial classification. We do not believe that this assertion, standing alone, insulates the EPA requirements from scrutiny.

First, the contract incorporates (and reprints some of) the EPA regulation. The regulation's text nowhere contains the phrase "good-faith effort." Rather, the regulation declares that, "It is EPA policy to award *a fair share* of subagreements to small, minority, and women's businesses." 40 C.F.R. § 33.240(a) (emphasis added). "Fair share" implies that the outcome must meet an implicit goal—a goal derivable from one's calculation of "fair share," but almost certainly non-zero. *Cf. Bras,*

---

**7.** At least, no party asserts that the regulations exempt MBE contractors, and the EPA documents in the Joint Appendix do not exempt MBE contractors.

59 F.3d at 875 ("While the Code and Order do not expressly state that public utilities must adopt any particular programs such as bidding preferences or set-asides, they clearly have the practical effect of requiring them to do so."); *Miami Tele–Communications, Inc. v. City of Miami,* 743 F.Supp. 1573, 1580 n. 8 (S.D.Fla.1990) (finding an implicit racial preference in a minority intern-hiring set-aside linked to "the racial and ethnic composition of the city"). From the beginning, the regulation anticipated that grant recipients (here, White House) would "use their own goals, State goals, or other *standards*" 48 Fed. Reg. at 12923 (emphasis added). The relevant EPA Guidance directed each recipient to implement the "fair share objective" by establishing an "objective which it considers reasonable and achievable based on a number of factors such as the availability of minority and women-owned businesses in the geographic area where the project is being built." Used thus, "objective" means an objective, not subjective, standard by which to measure compliance.

Second, the text commands that recipients "take affirmative steps to *assure* that small, minority, and women's businesses *are used when possible....*" 40 C.F.R. § 33.240(a) (emphases added). To this end, the regulation lists several "affirmative steps," but the steps exist to fulfill the goal of using—not merely soliciting or conducting outreach towards—MBEs. *Cf.* J.A. 1092 (reprinting "Attachment No. 9" to the contract) ("[T]he [successful] bidder must submit to the EPA ... evidence of the positive steps taken to utilize small, minority, and women's businesses.").

Thus, the regulation anticipates the formulation of numerical objectives (through recipients' "fair share objectives"), or at least the creation of subcontracting "goals." The government cannot omit the word "quota" and thereby insulate its regulations from scrutiny. *See Lutheran*

*Church–Missouri Synod v. FCC,* 154 F.3d 487, 491–92 (D.C.Cir.1998) (rejecting argument that "a regulation constitutes a racial classification only if it requires or obliges someone to exercise a racial preference") ("Although an analysis of the degree of government pressure to grant a racial preference would no doubt be significant in evaluating whether a regulation survives strict scrutiny, it is the *fact* of this encouragement—a fact that no one denies—that makes this regulation [an affirmative action hiring program] a racial classification."); *Monterey Mechanical,* 125 F.3d at 710–11; *Bras,* 59 F.3d at 874 ("The Code and Order are not immunized from scrutiny because they purport to establish 'goals' rather than 'quotas.' We look to the economic realities of the program rather than the label attached to it."). *But see Harrison & Burrowes Bridge Constructors, Inc. v. Cuomo,* 981 F.2d 50, 60 (2d Cir.1992) (construing "fair share" language as requiring only good-faith solicitation efforts and not requiring "particular set-asides," and thus not objectionable unless implementing regulations impose unconstitutional conditions.)

The parties discuss "good-faith efforts" regarding MBE subcontractors because, even though that phrase does not seem to appear in the official EPA documents (at least those referenced by, or reprinted in, the contract), Nancy Barron claimed to apply that standard to Eatherly. Barron admitted that neither Tennessee nor White House (the EPA recipient) established a "fair share goal" for the project.[8] She claimed that, "In situations like this, I evaluated a prime contractor's effort at compliance with the EPA's policies and regulations by whether it made a good-faith effort to solicit WBE/MBE participation, not on whether any particular level of WBE/MBE participation was achieved." This court cannot find provisions in the contract or regulation that anticipated

---

**8.** That failure appears to violate the EPA requirements, which directly govern grant recipients (*e.g.,* White House), and, via incorporation in the contract, indirectly govern contractors. The EPA Guideline required recipients to establish "fair share objectives."

that, in the absence of a "fair share goal," an EPA official would resolve matters on a case-by-case basis.

Safeco contends that, rather than apply a standard of "good-faith attempt to solicit," EPA actually required the hiring of MBE subcontractors. Such a requirement would appear to impose a race-based preference, requiring strict scrutiny. Government actions might still incur strict scrutiny if they forced contractors to make a good-faith effort to "solicit" MBE subcontractors, but did not "require or induce" the contractors to hire MBEs.[9] If not for the district court's factual finding—which the jury will re-visit on remand—that Barron did not require Eatherly to hire MBEs, this case might fall on all fours with *Lutheran Church*. There, the D.C. Circuit wrote that affirmative action hiring incentives that "indisputably pressure—even if they do not explicitly direct or require—[radio] stations to make race-based hiring decisions" require strict scrutiny. *Lutheran Church*, 154 F.3d at 491. That opinion expressly did not reach the question "[w]hether the government can encourage—or even require—an outreach program [which the court contrasted with 'actual hiring'] specifically targeted on minorities." *Id.* at 492. Perhaps the reasoning underlying *Lutheran Church*, *Monterey Mechanical* and *Bras* dictates that the government imposes a racial classification when it compels all contractors to solicit minority subcontractors. After all, such a policy would impose compliance costs on contractors and will harm white subcontractors if it imposes a racial preference. *Lutheran Church*'s standard appears to justify the application of strict scrutiny whenever the government "encourage[s]" racial preferences, *Lutheran Church*, 154

F.3d at 492, and the "good faith" requirement certainly has the effect of increasing hiring of MBEs.

We do not resolve the above issues, but present them as a guide for the district court. Although explicit racial preferences must withstand strict scrutiny, the government may not avoid searching review merely by invoking the phrase "good-faith effort to solicit." Such a phrase masks factual contingencies with a large potential impact. EPA's definition of "good faith" may impose an onerous burden. For example, EPA could conceivably require a contractor to act in "good faith" by mailing bid invitations to every minority subcontractor in the continental United States and by submitting notarized reports, in triplicate, that list the responses, analyze the bids in exhaustive detail, and painstakingly justify the reasons for selecting non-MBE subcontractors. Documentation requirements and the geographic scope of solicitation—both of which are implicated in the instant appeal—represent elements that the court should consider before evaluating whether the requirements "indisputably pressure[d]," *Lutheran Church*, 154 F.3d at 491, Eatherly to hire MBEs.

Also, although White House and EPA appear to contend that "solicitation" merely compels "outreach," the record suggests that EPA interpreted the regulation in accordance with its plain meaning, requiring an outcome resulting in the hiring of an MBE subcontractor. *See, e.g.*, note 9 *supra*. The government commands more than "solicitation" when it mandates that, in the case of "competitive" bids between MBE and non-MBE subcontractors (and "competitive" seems far more

**9.** The difference seems slim; how can one "solicit" in good faith but not violate the regulations by choosing not to hire the MBE? One possible answer: "solicitation" requires only outreach, while hiring requires commitment. Thus, if a contractor had the choice of an MBE and a non-MBE subcontractor with equivalent bids, the contractor may choose the non-MBE subcontractor and still comply with a "solicitation" requirement. Barron appears to have required more, stating that, if Eatherly had received competitive bids from an MBE and a non-MBE subcontractor, Eatherly would have had to use the MBE subcontractor. *See* Barron Decl., J.A. 1119 at ¶ 12; Barron Testimony, J.A. 925.

vague than "identical"[10]), it expects the contractor to "utilize" the MBE subcontractor. *See* Barron Decl. at ¶ 12. Outreach efforts may or may not require strict scrutiny. *See, e.g., Allen v. Alabama State Bd. of Educ.,* 164 F.3d 1347, 1352 (11th Cir.1999) (ruling that "strict scrutiny is generally inapplicable" to outreach efforts that target one race). But, where "outreach" requirements operate as a *sub rosa* racial preference—that is, where their administration "indisputably pressures" contractors to hire minority subcontractors—courts must apply strict scrutiny. *See Lutheran Church,* 154 F.3d at 491; *Sussman v. Tanoue,* 39 F.Supp.2d 13, 26 (D.D.C. 1999) (distinguishing benign from suspect "outreach" programs, emphasizing that the latter "lead[ ] to racial preferences in hiring decisions"; also, considering whether the administering agency has enforcement or disciplinary authority over the party making the hiring decision). Once a court establishes that the government imposes a racial classification, the court must apply strict scrutiny regardless of the strength of the perceived adverse impact of the classification. *See, e.g., Walker v. City of Mesquite, Tex.,* 169 F.3d 973, 981 (5th Cir.1999).

### IV. Proceedings After Remand

#### A. Damages

The question of damages arose at a hearing held before the appeal of *Safeco I.* During the hearing, White House offered to present evidence of its damages, and Safeco objected, claiming, "We didn't realize that this was an aspect of the proceeding before this Court today and are not prepared to go forward with it." The judge asked if Safeco intended later to offer proof, and Safeco responded ambiguously, "The difference between the two

bids—the difference is what it is. I mean, there is really no dispute as to the difference...." One may interpret this as does White House, as conceding the issue of damages, or one may see it as does Safeco, as declining a futile challenge to White House's arithmetic calculation of its claimed measure of damages. After this exchange, White House called the Mayor, who testified only about the difference in the two bids.

On May 14, 1993, the district court granted White House's motion for summary judgment. The court wrote, "Upon review of the evidence presented at the oral argument and the record in this case, the Court finds that White House is entitled to a judgment against Safeco in the principle [sic] amount of $352,847.08 [and pre-judgment interest and costs and attorney's fees]." Safeco appealed.[11] This court upheld the district court's ruling that a contract existed, but we vacated the judgment and remanded for proceedings regarding whether Eatherly breached. *See Safeco I,* 36 F.3d at 548.

The district court scheduled a trial, and Safeco filed a "Pre-Trial Conference Argument," in which it challenged the calculation of damages. The court granted White House's competing motion and ruled that "the principal measure of damages in this case is, as this Court previously held in its Order entered May 17, 1993, the difference between the Eatherly ... bid and the second low bidder's contract price." The court did not submit the damages question to the jury; after the trial, in the final judgment, it explained that, "in keeping with the law of the case, this Court enters judgment for that principal amount of damages against Safeco Insurance Company."

---

**10.** *Cf. Taxman v. Board of Educ.,* 91 F.3d 1547, 1549 (3rd Cir.1996) (en banc) (answering in the affirmative the question of "whether the Board of Education of the Township of Piscataway violated [Title VII] when it made race a factor in selecting which of two equally qualified employees to lay off"), *cert. dis-*

*missed,* —— U.S. ——, 118 S.Ct. 595, 139 L.Ed.2d 431 (1997).

**11.** In Safeco's briefs submitted in its first appeal, Safeco challenged the calculation of damages.

It appears that the "law of the case" does not bar appellate review of the award of damages in the court below. This court did not reach the issue of damages in *Safeco I*, but it vacated the "judgment and award of attorney fees," *Safeco I*, 36 F.3d at 548, and affirmed only "the district court's conclusion that a contract existed." *Ibid.* Further, the law of the case did not bar reconsideration by the district court of the damages. *Cf. Kavorkian v. CSX Transp., Inc.*, 117 F.3d 953, 959 (6th Cir.1997) ("Our remand for a new trial rendered it unnecessary for us to consider the issue of damages, and the failure of the mandate to discuss the issue of damages meant that the district court was free to submit that issue to the jury."); *Gaines v. Dougherty County Bd. of Educ.*, 775 F.2d 1565, 1569 (11th Cir.1985) (explaining why law of the case did not bar appellate review of court's denial of attorney's fees).

This court has set forth the applicable law:

Unquestionably, the district court, exercising diversity jurisdiction over a breach of contract claim involving a contract provision whereby the parties concurred that the agreement would be governed by Tennessee law, was required to apply the Volunteer state's law regarding proof of damages. Under Tennessee law, the purpose of awarding damages in breach of contract actions is to compensate for damages actually incurred by placing the plaintiff in the position he would have occupied had the contract been fulfilled in accordance with its terms, not to provide a windfall for the plaintiff. The plaintiff bears the burden of proving damages, and without adequate proof, there can be no award of damages in any amount.

*Grantham and Mann, Inc. v. American Safety Prods., Inc.*, 831 F.2d 596, 601 (6th Cir.1987) (citations omitted).

The district court may have provided a windfall for White House, which bears the burden of proving damages. Safeco offered evidence that EPA gave White House an additional grant of $375,811 "due to a bid overrun." This grant suggests that the damages award gives a windfall to White House. Tennessee does not apply the collateral source rule to contract actions. *See Drewry v. Continental Cas. Co.*, No. 03A01–9111–CH–417, 1992 WL 60876, at **5–6 (Tenn. Ct.App. Mar.30, 1992); *cf. United States v. City of Twin Falls, Idaho*, 806 F.2d 862, 873–74 (9th Cir.1986) (concluding that Idaho would not apply the collateral source rule to preclude offsets for EPA grants for an Idaho waste treatment project), *cert. denied sub nom., City of Twin Falls, Idaho v. Envirotech Corp.*, 482 U.S. 914, 107 S.Ct. 3185, 96 L.Ed.2d 674 (1987).[12] The district court erred by refusing to consider evidence that White House received a compensatory EPA grant.

Safeco's other claims appear to lack merit. Even if Moore charged White House for increased material costs, the bid price would not reflect those later costs. Because the court based the damages on the bid price, subsequent charges would not affect Safeco. As for Moore's alleged breach of EPA violations, this conflates the issue of breach with that of damages. Safeco should have pled this as an affirmative defense, but it expressly limited its "equitable" arguments to the calculation of damages. Finally, Safeco must do more than demand that White House have rebid the project after Eatherly withdrew. Had Eatherly never submitted a bid, no evidence suggests that White House would not have chosen Moore as low bidder. The expense and delay of rebidding the

---

12. White House cites several contrary cases, each distinguishable and not controlling. White House also claims that an EPA regulation will require it to reimburse EPA. *See* 40 C.F.R. § 35.945(d). The regulation does not clearly apply, however, and White House should address this argument to the district court.

Project may have yielded no lower bid; after all, Moore had an incentive to make its lowest feasible bid during the first bidding.

On remand, the district court should place the burden on White House to establish that it suffered damages and that an award would do no more than restore it to the position it would have occupied had Eatherly performed. This inquiry will require the parties to discuss, and the court to decide, the effect of the EPA grant and the EPA regulation that White House alleges will requires White House to reimburse EPA if White House triumphs. *See* note 11 *supra*. Appellants also appeal the award of costs and attorney's fees, and White House cross-appeals the denial of pre-judgment interest. Because we remand for a new trial, and because resolution of those issues (if they re-arise) will not require an inquiry similar to the one necessary for assessing damages, we express no opinion on the district court's rulings awarding costs and attorney's fees to White House and denying White House pre-judgment interest.

### B. Further Proceedings

On remand, a jury will decide whether Eatherly satisfied its obligation to make good-faith efforts to comply with its contractual duties; specifically, the jury will determine whether Eatherly attempted in good faith to obtain EPA approval. To assess Eatherly's good faith, the jury should limit its inquiry to the requirements known to Eatherly—namely, the contract provisions, any regulations incorporated in the contract, and the instructions conveyed to Eatherly by representatives of White House and EPA.[13] Because White House asserts that Eatherly breached, White

House bears the burden of proof. If Appellants convince the jury that Eatherly had a good-faith belief that the contract permitted withdrawal after ninety days, Eatherly's actions after withdrawal would have no relevance for assessing its efforts to comply with the EPA regulations. If Appellants fail to convince the jury of Eatherly's good-faith belief in withdrawal, the jury may use the 28–day period as relevant evidence of Eatherly's failure to make a good-faith effort to obtain EPA approval. Regardless of the jury's decision, White House retains the burden of proof on breach, and Appellants should not have to prove that it would have been "futile" for Eatherly to obtain EPA approval in the 28–day period. Of course, if the jury finds that Eatherly undertook good-faith efforts to satisfy its contractual obligations, Appellants prevail and the constitutional and damages issues become moot.

Second, the jury will decide how EPA applied the requirements to Eatherly. This finding of fact will require the jury also to consider Barron's subjective interpretation of the requirements. This finding of fact will involve at least three components: what EPA intended Eatherly to do to satisfy EPA, how Eatherly had to document its actions, and how EPA would evaluate whether Eatherly complied. Using this finding of fact, the district court will decide whether EPA's actions in applying the requirements were constitutional.

If the jury finds that Eatherly breached, and the court finds that the EPA requirements did not violate the Constitution, the court should hold a hearing to assess damages against Eatherly. At the hearing, Appellants may present evidence of the

---

**13.** Also, Appellants argue that Barron acted "ultra vires" in applying her subjective interpretation of the EPA requirements. Presumably, Appellants mean that the trial should not have involved Barron at all: if Eatherly had a good-faith duty to comply with the contractual provisions, and if the contract does not mention Barron's subjective judgment, Barron's subjective judgment has no

relevance to a determination of whether Eatherly made a good-faith effort to comply with the contract. We do not find this argument preserved from the judgments below, and thus do not pass on it today. We note that Appellants may raise the argument in future proceedings, and we believe that the district court may best decide whether the argument has force.

EPA grant, and White House may argue the import of the EPA regulation that allegedly requires repayment of the grant. We express no opinion as to the district court's rulings on costs and attorney's fees, and on pre-judgment interest.

## C. Conclusion

The judgments of the district court are VACATED and the case is REMANDED for further proceedings consistent with this opinion.