RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 11a0197p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

NORTHRIDGE CHURCH, fka Temple Baptist
Church, a Michigan ecclesiastical
corporation,

          *Plaintiff-Appellant,*

     *v.*

CHARTER TOWNSHIP OF PLYMOUTH;
PLYMOUTH TOWNSHIP PLANNING BOARD,

          *Defendants-Appellees.*

No. 09-2388

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 94-74045—Denise Page Hood, District Judge.

Argued: June 8, 2011

Decided and Filed: July 28, 2011

Before: COLE, CLAY, and GILMAN, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Martin L. Roth, KIRKLAND & ELLIS LLP, Chicago, Ilinois, for
Appellant. Timothy S. Wilhelm, JOHNSON, ROSATI, LaBARGE, ASELTYNE &
FIELD, P.C., Farmington Hills, Michigan, for Appellees. **ON BRIEF:** Martin L. Roth,
Richard C. Godfrey, P.C., KIRKLAND & ELLIS LLP, Chicago, Ilinois, Daniel P.
Dalton, TOMKIW DALTON, PLC, Bloomfield Hills, Michigan, for Appellant.
Marcelyn A. Stepanski, JOHNSON, ROSATI, LaBARGE, ASELTYNE & FIELD, P.C.,
Farmington Hills, Michigan, for Appellees.

———————————

**OPINION**

———————————

COLE, Circuit Judge.  This appeal is the latest chapter in the rocky relationship between a church and the township in which it sits.  Plaintiff-Appellant Northridge Church is a sizeable ecclesiastical organization located in Defendant-Appellee Charter Township of Plymouth, Michigan.  Seventeen years ago, Northridge sought a special permit from Plymouth to build its church and related structures in the Township.  Fearful of the impact Northridge would have on the community, Defendant-Appellee Plymouth Township Planning Board denied Northridge's application.  Northridge fought back through commencement of this litigation and wrestled a partial victory:  It reached a consent judgment with Plymouth allowing Northridge to build its church, albeit with a number of limitations.  Nearly sixteen years later, Northridge seeks to modify or set aside the consent judgment to which it once agreed.  Because the consent judgment was not void when entered and Northridge has not shown that the factual or legal landscape has unexpectedly and dramatically changed since that time, we **AFFIRM** the district court's judgment denying Northridge's motion to modify or set aside the consent judgment.

**I. BACKGROUND**

Northridge Church ("Northridge"), formerly known as Temple Baptist Church, is an ecclesiastical corporation in Michigan.  In 1994, Northridge petitioned the Charter Township of Plymouth, Michigan ("Township") for special land-use exemptions to use a piece of property it had purchased in Plymouth for a church and related recreational and accessory purposes.  Previously, the property was a 55.8 acre plot zoned for agricultural use.  To qualify for the changed zoning category, Northridge had to prove that the requested zoning uses were: (1) "in harmony with the appropriate and orderly development of the district and [would] not be detrimental to the orderly development of the adjacent districts"; (2) regarding "vehicular circulation[,] . . . in the best interest

of the public health, safety and welfare"; (3) "not objectionable to nearby uses or dwellings by reason of noise fumes or flash of lights or . . . potential of endangering the public safety"; (4) regarding "proposed site layout[, adequate to] . . . ensure [that] the use and associated activities [would] not hinder project development or existing uses on adjacent properties"; and (5) regarding "location, use and assembly of persons in connection with the [proposed] uses[,] . . . not hazardous to the Planning Unit." (Letter of Plymouth Cmty. Dev. Dir. of May 12, 1994, Dist. Ct. Docket No. 50-5, at 42-43 (citing Plymouth Zoning Ordinance § 2.7).)

At that time, the area surrounding Northridge's property included a multiple-family residential development (to the north), a single-family residential area and church (to the south), another single-family residential area accessible only through an unpaved road (to the east), and an expressway (to the west). Northridge specifically sought to build "a three wing building complex developed in phases, and outdoor sports and recreation facilities for softball, soccer, volleyball, picnicking and passive recreational activities." (McKenna Assocs. Cmty. Planning Letter of July 1, 1994, Dist. Ct. Docket No. 50-5, at 46.) Ultimately, this project would constitute "220,000 square feet of building area (upon completion of all phases), over 1,350 parking spaces, and a seating capacity of 4,000 people in the main auditorium/worship center." (*Id.*)

After a hearing, the Plymouth Township Planning Board (collectively with the Township, "Plymouth") denied Northridge's application. Plymouth did so because: (1) "the proposed location, size and character of the use will be in conflict and not in harmony with the appropriate and orderly development of the planned unit in which it is situated"; (2) "the proposed location, size and character of the use will be detrimental to the orderly development of adjacent districts and uses"; (3) "the vehicular circulation of the proposed use will not be in the best interest of the public health, safety and welfare in relationship to the egress and ingress to the site and adjacent residential use and vehicular turning movements"; (4) "the location, use and assembly of persons in connection with the proposed use will not be in harmony and will be hazardous and detrimental to the planning unit in which the use is located"; (5) "the location, use and

assembly of persons in connection with the proposed use will be in conflict with the normal traffic of the planned unit"; (6) "the proposed use will be in conflict with the spirit and intent of the master plan of the community and this area specifically"; and (7) "the proposed use and structures are not compatible with the definition of church as found in Ordinance 83 and said use and structures are out of scale with the low intensity residential use existing and projected to this area." (Plymouth Twp. Planning Comm. Aug. 17, 1994 Mtg. Minutes, Dist. Ct. Docket No. 50-5, at 79-80.) In short, Northridge "just doesn't fit here with this high intensity use." (*Id.* at 81; *see also* McKenna Assocs. Cmty. Planning Letter of July 1, 1994, Dist. Ct. Docket No. 50-5, at 46-53; McKenna Assocs. Cmty. Planning Letter of Aug. 12, 1994, Dist. Ct. Docket No. 50-5, at 58-63.)

Northridge then sued Plymouth in the Wayne County Circuit Court in Michigan. In its complaint, Northridge alleged that Plymouth's zoning restrictions violated its right to freely exercise its religion under: the First Amendment to the U.S. Constitution; Article 1, Section 4 of the Michigan Constitution; and the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb et seq., *held unconstitutional by City of Boerne v. Flores*, 521 U.S. 507 (1997). Northridge also alleged that these zoning restrictions, and Plymouth's actions thereunder, violated its rights to freedom of speech and assembly under the First Amendment to the U.S. Constitution, and to procedural due process under the Fourteenth Amendment to the U.S. Constitution. Plymouth removed the case to the U.S. District Court for the Eastern District of Michigan.

Northridge and Plymouth ultimately agreed to a consent judgment, which the district court entered on October 27, 1995. That judgment permitted Northridge to build—and use—a church and related structures on its 55.8 acre property, but with certain restrictions. Relevant to this litigation are the limits on: the total auditorium seating (for no more than 3,500 individuals); the total number of parking spaces (no more than 1,167); parking on Northridge's lawn, driveways, or approaches, or on the roads surrounding Northridge (all prohibited); the number of musical service events (no more than fourteen annually, excluding Christmas and Easter, and only at certain times of day); the activities that could take place on Northridge's property (using any part of

the land "as a soup kitchen or to provide housing on a temporary or permanent basis" is prohibited); traffic patterns entering and exiting the property (turning right out of the parking lot is prohibited); and Northridge's use of its outdoor areas (only picnicking, baseball, fishing, running, and outdoor Easter sunrise services are allowed). The district court retained jurisdiction to oversee and enforce the consent judgment.

At the time that Northridge entered into the consent judgment, the average weekly attendance at its Sunday services approximated 1,100. The attendance, however, had grown to approximately 14,000 by the time of this renewed litigation. This growth has required Northridge to hold several weekly services due to space limitations, and has prevented Northridge from undertaking some non-service activities because of the other restrictions. The parking limitations, while initially more than adequate, now require Northridge to spend as much as $300,000 each year on shuttle costs. Also, the area surrounding Northridge has experienced some development, and the road bordering Northridge is now paved.

Due to the expansion of its membership and desired services, Northridge moved to reopen this case and modify or set aside the consent judgment under Rule 60(b) on September 30, 2008. Plymouth opposed this action, and the district court denied Northridge's motion. Northridge then filed a motion for reconsideration, but the district court denied that as well. Northridge timely appealed both denials.

## II. JURISDICTION

Plymouth first argues that we do not have jurisdiction to adjudicate Northridge's consent-judgment challenge because the consent judgment does not affect rights protected by the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc et seq. This contention is plainly incorrect. The district court had jurisdiction over this litigation under 28 U.S.C. § 1331—because Northridge alleged that Plymouth violated a host of federal laws—as well as section 4.7 of the consent judgment, which states: "This Court retains jurisdiction to assure compliance with the terms of this Consent Judgment and to grant whatever legal and/or equitable relief or

remedies which the Court deems appropriate." (Consent Judgment, Dist. Ct. Docket No. 43-3, § 4.7.)   And "[i]t is settled law that a Rule 60(b) motion is considered a continuation of the original proceeding.  If the district court had jurisdiction when the suit was filed, it has jurisdiction to entertain a Rule 60(b) motion." *East Brooks Books, Inc. v. City of Memphis*, 633 F.3d 459, 465 (6th Cir. 2011) (internal quotation marks omitted).  We have jurisdiction under 28 U.S.C. § 1291.

### III. ANALYSIS

Northridge seeks to set aside the consent judgment under Rule 60(b)(4) of the Federal Rules of Civil Procedure, or to modify the consent judgment under Rule 60(b)(5) of the Federal Rules of Civil Procedure.  The former "relieve[s] a party . . . from a final judgment" where "the judgment is void," Fed. R. Civ. P. 60(b)(4), and the latter where "applying [the judgment] prospectively is no longer equitable," Fed. R. Civ. P. 60(b)(5). We address each argument in turn.

### A. Relief Under Rule 60(b)(4)

Northridge's first—and central—claim is that "the consent judgment was legally void for violating RLUIPA."  (Northridge Br. 18.)

#### 1. Standard of Review

The parties disagree about the correct standard of review for this claim. Northridge argues that our review should be de novo, because we are reviewing the district court's denial of a motion to set aside an allegedly void judgment under Rule 60(b)(4).  Plymouth contends that entering into a consent judgment is a "voluntary dismissal," so our review should be for abuse of discretion under *Warfield v. AlliedSignal TBS Holdings, Inc.*, 267 F.3d 538, 542 (6th Cir. 2001).

We have explained that we "review de novo a district court's denial of a Rule 60(b)(4) motion." *Gen. Star Nat'l Ins. Co. v. Administratia Asigurarilor de Stat*, 289 F.3d 434, 437 (6th Cir. 2002).  Deference is inappropriate in this context because, "if the underlying judgment is void, it is a *per se* abuse of discretion for a district court to deny

a movant's motion to vacate the judgment under Rule 60(b)(4)." *Antoine v. Atlas Turner, Inc.*, 66 F.3d 105, 108 (6th Cir. 1995) (internal quotation marks omitted). *Warfield* does not alter this standard, since that case relied on a Rule 41(a)(1)(i) voluntary dismissal with prejudice to assess the Rule 60 motion for an abuse of discretion. 267 F.3d at 541-42. Because entry into a consent judgment is not analogous to a dismissal with prejudice under Rule 41, we review Northridge's Rule 60(b)(4) challenge de novo. *Id.*; *see also Gen. Star Nat'l Ins. Co.*, 289 F.3d at 437.

### 2. Merits

Northridge argues that the consent decree is *void* because it is invalid under RLUIPA. But in its eagerness to proceed to the merits of its RLUIPA argument, Northridge overlooks the Supreme Court's recent decision in *United Student Aid Funds, Inc. v. Espinosa*, --- U.S. ---, 130 S. Ct. 1367 (2010). In that opinion, the Court explained that "[a] void judgment is a legal nullity." *Id.* at 1377 (citing Black's Law Dictionary 1822 (3d ed. 1933)); *see also Jalapeno Prop. Mgmt., LLC v. Dukas*, 265 F.3d 506, 515 (6th Cir. 2001) (Batchelder, J., concurring) ("A void judgment is one which, from its inception, was a complete nullity and without legal effect." (quoting *Lubben v. Selective Serv. Sys. Local Bd. No. 27*, 453 F.2d 645, 649 (1st Cir. 1972))). "'A judgment is not void . . . simply because it is or may have been erroneous,'" *Espinosa*, 130 S. Ct. at 1377 (quoting *Hoult v. Hoult*, 57 F.3d 1, 6 (1st Cir. 1995); 12 J. Moore et al., Moore's Federal Practice § 60.44[1][a], at 60-150 to 60-151 (3d ed. 2007)), and "a motion under Rule 60(b)(4) is not a substitute for a timely appeal," *id.* Otherwise, "Rule 60(b)(4)'s exception to finality would swallow the rule." *Id.* The Court then held that "Rule 60(b)(4) applies only in the rare instance where a judgment is premised *either on a certain type of jurisdictional error or on a violation of due process* that deprives a party of notice or the opportunity to be heard." *Id.* (emphasis added); *see also Antoine*, 66 F.3d at 108 ("A judgment is void under [Rule] 60(b)(4) if the court that rendered it lacked jurisdiction over the subject matter, or of the parties, or if it acted in a manner inconsistent with due process of law." (internal quotation marks omitted)). Accordingly, the fact that a consent judgment may violate a federal statute, let alone a subsequently-

enacted federal statute, does not render the judgment "void" under Rule 60(b)(4). Northridge does not rely on either of the two bases that would allow it to challenge the consent judgment under Rule 60(b)(4)—a lack of jurisdiction or a violation of due process in the judgment's issuance—so the consent judgment is not void. *See Espinosa*, 130 S. Ct. at 1377.

However, Northridge also contends that "[a] consent judgment that violates federal law or constitutional rights must be vacated as void even when the parties have agreed to its entry." (Northridge Br. 40.) But such an argument is cognizable only to the extent that the district court improperly entered the consent judgment or the subsequent enactment of a new law invalidated it. *See* Fed. R. Civ. P. 60(b)(4)-(5); *Espinosa*, 130 S. Ct. at 1377. Perhaps realizing as much, Northridge suggests in its reply brief that this contention falls in the former category, and that the consent judgment is void because it "violated RFRA in the first place." (Northridge Reply Br. 25; *see also id.* at 10 n.4 ("[P]arties cannot, by consent or otherwise, agree to violate federal law.").) In support of this argument, Northridge directs us to the Second Circuit's decision in *Crosby v. Bradstreet Co.*, 312 F.2d 483 (2d Cir. 1963), the Supreme Court's opinion in *Shelley v. Kraemer*, 334 U.S. 1 (1948), and our own opinion in *Safeco Insurance Co. of America v. City of White House*, 191 F.3d 675 (6th Cir. 1999) ("*Safeco Insurance*").

None of these decisions is on point. As an initial matter, *Safeco Insurance* is entirely inapposite because it deals with purportedly unconstitutional regulations, not consent judgments or other judicially enforced agreements. 191 F.3d at 684. Meanwhile, in *Kraemer*, the Supreme Court invalidated racially restrictive covenants in land deeds because, though "defined initially by the terms of a private agreement," the covenants "denied petitioners the equal protection of the laws." 334 U.S. at 20. The Court reasoned that state action countenancing racial discrimination against other individuals, who were not parties to the initial covenant, could not escape the Equal Protection Clause's reach simply because a private party at some point agreed to the covenants. *Id.* at 20-21. There is no similar effect here on the rights of non-parties to the original agreement. While parties may not agree to an imposition on *another*

*person's* rights, *see id.*, courts regularly allow individuals to forego—or "waive"—the full scope of *their own* rights, for example, in the context of a criminal defendant accepting a plea bargain. *See, e.g.*, *New York v. Hill*, 528 U.S. 110, 114 (2000) ("[W]e have recognized that the most basic rights of criminal defendants are subject to waiver . . . ." (internal quotation marks and brackets omitted)).

Finally, in *Crosby*, the Second Circuit set aside an "order[,] entered on consent," that required a party "to refrain from publishing matter about" the other party. 312 F.2d at 485. However, the court in *Crosby* set aside the order because "[t]he court was without power to make such an order." *Id.*; *accord Robert E. Hicks Corp. v. Nat'l Salesmen's Training Ass'n*, 19 F.2d 963, 964 (7th Cir. 1927) ("The general rule is that a court of equity will not enjoin the publication of a libel."). Therefore, *Crosby* rested on a unique *jurisdictional* issue that rendered the court entering the order without power to do so. Rule 60(b)(4) would be the proper vehicle for such a challenge, but no analogous issue prohibits jurisdiction here. *See Espinosa*, 130 S. Ct. at 1377.

We thus reject Northridge's argument that the consent judgment is void.

**B. Relief Under Rule 60(b)(5)**

Northridge's second argument is that changed legal and factual circumstances require modification of the consent judgment under Rule 60(b)(5).

**1. Standard of Review**

Rule 60(b)(5) states, in relevant part: "On motion and just terms, the court may relieve a party . . . from a final judgment, order or proceeding [because] . . . applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5). This "[r]ule provides a means by which a party can ask a court to modify or vacate a judgment or order if a significant change either in factual conditions or in law renders continued enforcement detrimental." *Horne v. Flores*, --- U.S. ---, 129 S. Ct. 2579, 2593 (2009). We review for an abuse of discretion the claim that "applying [the consent judgment] prospectively is

no longer equitable." Fed. R. Civ. P. 60(b)(5); *see Blue Diamond Coal Co. v. Trs. of UMWA Combined Benefit Fund*, 249 F.3d 519, 524 (6th Cir. 2001).

## 2. Applicability of Rule 60(b)(5) to Consent Judgments

Relying on *Kalamazoo River Study Group v. Rockwell International Corp.*, 355 F.3d 574 (6th Cir. 2004), Plymouth contends that Rule 60(b)(5) does not permit modification of the consent judgment because such a judgment is not prospective. In support of this position, Plymouth quotes the following language from *Kalamazoo River Study Group*:

> The mere possibility that a judgment has some future effect does not mean that it is "prospective" because virtually every court order causes at least some reverberations into the future, and has . . . some prospective effect. The essential inquiry into the prospective nature of a judgment revolves around whether it is executory or involves the supervision of changing conduct or conditions.

*Id.* at 587 (internal quotation marks and citations omitted).

However, the first sentence of the next paragraph in *Kalamazoo River Study Group* undermines Plymouth's argument: "Most cases consider Rule 60(b)(5)'s 'prospective application' clause in the context of consent decrees, which are prospective by nature." *Id.* at 588. We then went on to explain that consent decrees and consent judgments are the prototypical subjects of Rule 60(b)(5) motions. *Id.*

Indeed, the Supreme Court has explained that "[a] consent decree no doubt embodies an agreement of the parties and thus in some respects is contractual in nature. But it is an agreement that the parties desire and expect will be reflected in, and be enforced as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees." *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 378 (1992). And the consent judgment here is a prime example of this fact, as it imposes ongoing restrictions on Northridge's ability to build or undertake various activities, all of which are supervised by the district court. (*See* Consent Judgment, Dist. Ct. Docket No. 43-3.) Rule 60(b) is thus just as applicable to motions to modify or vacate consent judgments

as it is to motions to modify or vacate other judgments.  *See Rufo*, 502 U.S. at 378; *Kalamazoo River Study Group*, 355 F.3d at 588.

### 3. Merits

Under Rule 60(b)(5), a court may modify a consent judgment when "it is no longer equitable that the judgment should have prospective application."  Fed. R. Civ. P. 60(b)(5).  This rule does not allow modification simply "when it is no longer *convenient* to live with the terms of a consent decree," but solely when there is "a significant change either in factual conditions or in law."  *Rufo*, 502 U.S. at 383-84 (emphasis added).  The party seeking to show such a change "bears the burden of establishing that a significant change in circumstances warrants revision of the decree." *Id.* at 383.  If that party carries its burden, then the district court "should consider whether the proposed modification is suitably tailored to the changed circumstance." *Id.*  We further observe at the outset that "modification of a consent decree is an extraordinary remedy that should not be undertaken lightly."  *East Brooks Books*, 633 F.3d at 465 (internal quotation marks omitted).  Northridge asserts that modification is necessary in light of significant changes in both legal and factual circumstances.  We disagree.

### a. Changed Legal Circumstances

Northridge argues principally that the enactment of RLUIPA five years after entry of the consent judgment constitutes a changed legal circumstance that warrants modification of the consent judgment.  Plymouth responds that RFRA governed the same conduct as RLUIPA, so RLUIPA's enactment is not a "changed circumstance."

In *Rufo*, the Supreme Court explained that "[a] consent decree must be modified if, as it later turns out, one or more of the obligations placed upon the parties has become impermissible under federal law."  502 U.S. at 388.  Alternatively, "modification of a consent decree may be warranted when the statutory or decisional law has changed to make legal what the decree is designed to prevent."  *Id.*  Also, "[w]hile a . . .

clarifi[cation of] the law will not, in and of itself, provide a basis for modifying a decree, it could constitute a change in circumstances that would support modification if the parties based their agreement on a misunderstanding of the governing law." *Id.* at 390. Northridge does not claim that RLUIPA "ma[de] legal what the decree is designed to prevent"; it only suggests that its "obligations [under the consent judgment] ha[ve] become impermissible under federal law." Our task is thus to determine whether RLUIPA constitutes a "*change . . .* in law," *Horne*, 129 S. Ct. at 2593 (emphasis added), under which "one or more of the obligations placed upon the parties *has become* impermissible," *Rufo*, 502 U.S. at 388 (emphasis added). *See also Agostini v. Felton*, 521 U.S. 203, 239 (1997) (allowing modification of a continuing injunction "in light of a bona fide, significant change in subsequent law"). This language contemplates modification of a consent judgment in light of an alteration in the legal landscape because parties negotiate for various benefits and burdens differently depending on what they are entitled to under federal law.

When the parties agreed to the consent judgment in 1995, RFRA was in effect, and that statute provided part of the basis for Northridge's lawsuit against Plymouth. RFRA proscribed any law that "substantially burdened" a person's religious exercise, unless the law was the "least restrictive means" of furthering a compelling state interest. 42 U.S.C. § 2000bb, *held unconstitutional by Flores*, 521 U.S. at 536. RLUIPA's strictures—though tailored specifically to zoning restrictions, instead of being generally applicable as in RFRA—are identical:

> No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution-- (A) is in furtherance of a compelling governmental interest; and (B) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc(a)(1). In fact, Congress intended that RLUIPA replace RFRA after the latter's invalidation by the Supreme Court. *See Cutter v. Wilkinson*, 544 U.S. 709,

715 (2005). Thus, in all relevant respects, the same test for First Amendment zoning challenges that existed at the time Northridge and Plymouth entered into the consent judgment applies now. The fact that case law has clarified the particular nuances of the test since the parties entered into the consent judgment is inadequate to establish changed legal circumstances under Rule 60(b)(5); otherwise, every affected consent judgment would be vulnerable to attack, a development that "would undermine the finality of such agreements and could serve as a disincentive to negotiation of settlements." *Rufo*, 502 U.S. at 389.

One final point cements our conclusion that the legal landscape has not changed such that Northridge should escape its obligations under the consent judgment: Northridge's initial complaint alleged that, "[u]nder [RFRA], the Township may not, through its Zoning Ordinance, place a substantial burden on the Church's exercise of its rights of freedom of religion unless the Township can demonstrate that its application of the Zoning Ordinance to the Church furthers a compelling governmental interest and is the least restrictive means" of doing so. (Compl., Dist. Ct. Docket No. 2 ¶ 22 (available electronically at Summons & Compl., Dist. Ct. Docket No. 50-5, at 18).) This is the exact challenge that Northridge now makes under RLUIPA. The district court therefore did not abuse its discretion in finding no significant change in the law between 1995 and now.

### b. Changed Factual Circumstances

Northridge contends also that its significant growth—as well as the development of both Plymouth generally and the area around the church specifically—renders the consent judgment "unduly onerous," because it claims the current factual circumstances are worlds apart from those under which it agreed to the consent judgment. In particular, Northridge argues that, due to its growth and the growth and development of Plymouth: (1) the "size of the facilities and the number of parking spots are egregiously inadequate"; (2) it must provide "expensive busing from off-site parking lots to the church . . . [to] make up for part of the discrepancy between the number of spots and the

number of visitors and regular church-goers"; and (3) "the size and number of Musical Service Events and Christmas and Easter celebrations" permitted by the consent judgment are inadequate to "provide all congregants an opportunity to attend these functions." (Northridge Br. 45.)  Northridge also contests the various timing limitations on its services, as well as the proscriptions on building a soup kitchen or homeless shelter on its property.  Alternatively, Northridge suggests that we "remand[ the case] to the district court for a factual hearing and new factual determinations under Rule 60(b)(5)." (*Id.* at 43.)  Plymouth, of course, believes that remand is unnecessary and that none of these circumstances warrant modification of the consent judgment.

Modification of a consent judgment is appropriate if: (1) "changed factual conditions make compliance with the decree substantially more onerous"; (2) "a decree proves to be unworkable because of unforeseen obstacles"; or (3) "enforcement of the decree without modification would be detrimental to the public interest." *Rufo*, 502 U.S. at 384.  Nevertheless,

> modification should not be granted where a party relies upon events that actually were anticipated at the time it entered into a decree.  If it is clear that a party anticipated changing conditions that would make performance of the decree more onerous, but nevertheless agreed to the decree, that party would have to satisfy a heavy burden to convince a court that it agreed to the decree in good faith, made a reasonable effort to comply with the decree and should be relieved of the undertaking under Rule 60(b).

*Id.* at 385.

As an initial matter, one of Northridge's officers avers that its "incredible" growth was "completely outside the contemplation of all parties at the time the Consent Judgment was negotiated and . . . could not have reasonably been foreseen." (King Aff., Dist. Ct. Docket No. 43-4, at 4.)  Citing *Keeler v. Mayor & City Council of Cumberland*, 940 F. Supp. 879, 883-84 (D. Md. 1996), Northridge suggests that this self-serving affidavit is enough to establish that it "never foresaw the tremendous growth of its congregation." (Northridge Br. 48.)  However, *Keeler* permitted the unrefuted affidavits

of clergy to establish the sincerity of certain religious beliefs, not the unanticipated nature of certain factual developments. *See Keeler*, 940 F. Supp. at 883. Still, Northridge's reliance on King's affidavit is unsurprising, for that document is the only piece of evidence Northridge submitted to the district court showing that its growth was unanticipated. Demonstrating that factual developments were not anticipated, however, requires more. *See, e.g.*, *Vanguards of Cleveland v. City of Cleveland*, 23 F.3d 1013, 1019 (6th Cir. 1994) (relying on evidence from the time of a consent judgment's entry to establish that factual developments were unanticipated). Moreover, the large size of the parcel of land Northridge purchased initially—55.8 acres—bolsters the inference that Northridge foresaw the scope of its growth.

Although Northridge's failure to show that it did not anticipate these changes does not end our inquiry, we note that Northridge must "satisfy a heavy burden to convince [us] that it agreed to the decree in good faith, made a reasonable effort to comply with the decree and should be relieved of the undertaking under Rule 60(b)." *Rufo*, 502 U.S. at 385. Northridge has not satisfied that "heavy burden" on this record and thus "should [not] be relieved of the undertaking."

First, Northridge challenges the prohibition on more than 3,500 seats in its main worship center. (*See* Consent Judgment, Dist. Ct. Docket No. 43-3, § 2.3.) Northridge argues that, "because its Musical Service Events are limited and only 3,500 people can attend each event, many of the Church's members and visitors are entirely denied the opportunity to participate in these integral parts of the worship mechanism for the church." (Northridge Br. 34 (internal quotation marks and brackets omitted).) Northridge claims that the seating limitation burdens its regular, Easter, and Christmas services as well. In effect, what Northridge seems to desire is to have all (or at least most) of its members worship and participate in church activities together.

While this arrangement would be ideal, we have suggested—albeit in a different context—that needing to conduct several services or activities to accommodate its members is not a substantial burden on a church. *See Living Water Church of God v.*

*Charter Twp. of Meridian*, 258 F. App'x 729, 738 (6th Cir. 2007) ("*Living Water*") (finding that a township's denial of a church's zoning permit "does not prevent church members from entering the property and conducting worship or prayer services[, or] . . . preclude the church from running religious programs and meetings in the evenings and on weekends," despite the church's contention that the zoning denial "caused the church to lose members because there is insufficient space and seating to add new services and accommodate new members"). Further, Northridge's desire to have all of its congregants worship together does not suffice to permit Northridge to avoid the consequences of what we must take to be Northridge's anticipated expansion. As we have noted, "[t]he fact that [a church]'s current facility is too small does not give the church free reign to construct on its lot a building of whatever size it chooses, regardless of limitations imposed by the zoning ordinances." *Id.* at 739.

Second, Northridge argues that the limitations on the number of annual musical events and the timing restrictions on Christmas and Easter services, (*see* Consent Judgment, Dist. Ct. Docket No. 43-3, § 2.5), are unduly onerous. We disagree. Certain limitations on the timing of activities are entirely reasonable. *Cf. Kovacs v. Cooper*, 336 U.S. 77, 81-83 (1949) (rejecting a First Amendment challenge to a city ordinance limiting disturbances at various times). And neighbors likely care little if the music emanating from Northridge's buildings or the noise from over a thousand cars honking or driving away is of a spiritual or secular character; a church must abide by nuisance limitations too. *Cf. id.*; *see also Living Water*, 258 F. App'x at 738 (permitting limitations on the timing and frequency of a church's activities).

Third, Northridge opposes the consent judgment's proscription of the use of Northridge's facilities "as a soup kitchen or to provide housing on a temporary or permanent basis," that is, as a homeless shelter. (Consent Judgment, Dist. Ct. Docket No. 43-3, § 2.10.) Though Northridge now complains about these limitations on its charitable services, it does not explain how its core beliefs have changed such that what it was willing to forego in 1995, it now deems necessary. Also, this prohibition does not bar Northridge from providing these services elsewhere. *See Living Water*, 258 F.

App'x at 739 (rejecting a church's argument that its inability to build a gymnasium on its property was unduly burdensome, because, "while we understand the church's reason for wanting a gymnasium—and we concede that it would be more convenient to have that facility onsite—we are hard-pressed to conclude that [the church] will be unable to carry out its church missions and ministries without it"). This argument is, therefore, not well taken.

Fourth, Northridge claims that the proscription on more than 1,167 parking spaces, (*see* Consent Judgment, Dist. Ct. Docket No. 43-3, § 2.2), is extremely constraining given the amount of its growth. Northridge has submitted evidence showing that it spends nearly $300,000 and devotes substantial volunteer effort annually in coordinating a shuttle service for those who cannot find parking on Northridge's property. That amount, in the abstract, appears quite significant; yet at oral argument Northridge noted that its average annual budget is about $10 million. The costs from this shuttle service, therefore, constitute only three percent of its annual budget. This percentage is certainly not insignificant, but given that Northridge has not established that its growth was unanticipated, we do not find this burden so onerous that it merits relief. Northridge has one parking spot for every three to four individuals on its property (assuming a full service of 3,500 and then additional individuals attending other functions on Northridge's property), which is not as restrictive a limitation as it may initially seem.

Fifth, Northridge avers that the character of Plymouth generally, and the area around its land specifically, have changed such that modification of the consent judgment is appropriate. In particular, Northridge points to the change in designation of the land surrounding that of Northridge from agricultural to urbanization/development, and the growth of Plymouth's population to 27,798. But Northridge acknowledged at oral argument—and, in any case, should have expected—that it knew Plymouth intended to grow and develop. Indeed, Plymouth's 1991 growth projection anticipated a population of 32,913 in 2005—much more than the actual population increase during that period. (*See* Excerpt from Plymouth Master Plan

– SEMCOG Projections, Dist. Ct. Docket No. 50-8.)  Also, while a road bordering Northridge has been paved, the majority of the area surrounding Northridge retains the same zoning designations, with one exception: the area to the south of Northridge is now zoned entirely as low-density residential, as opposed to both agricultural and low-density residential.  (*Compare* McKenna Assocs. Cmty. Planning Letter of July 1, 1994, Dist. Ct. Docket No. 50-5, at 47 (1994 zoning plan), *with* 2004 Zoning Ordinance Map, Dist. Ct. Docket No. 50-6, at 2.)  The development of an area, the building of some roads and other infrastructure, and an increase in a town's population are phenomena to be anticipated, and Northridge has not convinced us of any dramatic change in Plymouth between 1995 and the present necessitating modification of the consent judgment.

One final observation is in order.  Unlike many cases considering Rule 60(b)(5) challenges, where the change in factual circumstances was outside the movant's control, here the changed factual landscape stems mostly from Northridge's growth—something entirely within its own power.  To allow a party to escape a consent judgment based on *its own voluntary actions* strikes us as unjustified.

We thus find that the changed factual circumstances to which Northridge directs us, both individually and cumulatively, fail to satisfy the "heavy burden" of convincing us that the district court abused its discretion in declining to modify the consent judgment.

### 4. Remand

Northridge asks—in the alternative—that "this case . . . be remanded to the district court for a factual hearing and new factual determinations under Rule 60(b)(5)." (Northridge Br. 43.)  This request strikes us as odd, for Northridge possesses what evidence exists to support modification of the consent decree.  *Cf. Brown v. Neeb*, 644 F.2d 551, 560 (6th Cir. 1981) (noting that, if a court determines that modification is proper, modifying the judgment "would require a complete hearing and findings of fact" (citing *United States v. Atl. Refining Co.*, 360 U.S. 19, 23 (1959); *Hughes v. United States*, 342 U.S. 353, 357-58 (1953))).  As such, it could have—indeed, should

have—submitted all the evidence it desired the district court to consider in conjunction with its Rule 60(b) motion. Northridge does not explain why it did not do so, or what evidence Plymouth possesses in its sole control that Northridge needs. Instead, Northridge's request strikes us as a plea for a "do over," and we decline the invitation.

## IV. CONCLUSION

For the reasons explained above, we **AFFIRM** the district court's judgment.